IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Mamie D. Gordon, | ) | C/A No.: 1:15-3736-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On December 19, 2011, Plaintiff filed an application for SSI in which she alleged her disability began on March 3, 2011. Tr. at 158–66. Her application was denied initially and upon reconsideration. Tr. at 105–08 and 114–15. On March 19, 2014, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") Jane A. Crawford. Tr. at 34–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 27, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 13–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 17, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 40. She completed the tenth grade. *Id.* Her past relevant work ("PRW") was as a fast food worker and a marker/labeler. Tr. at 72. She alleges she has been unable to work since December 19, 2011.[1] Tr. at 40.

2.    Medical History

Plaintiff presented to Malik Ashe, M.D. ("Dr. Ashe"), on December 29, 2010, with a complaint of sharp pain that radiated from her right hip to her right leg. Tr. at 314. She stated her pain was worsened by standing and climbing stairs. *Id.* Dr. Ashe observed Plaintiff to appear malnourished and older than her stated age. *Id.* He noted positive tenderness to palpation in Plaintiff's right anterior hip joint and reduced active and passive range of motion ("ROM") with flexion, extension, and internal and external

---

[1] Because Plaintiff's claim was one for SSI only, she amended her alleged onset date ("AOD") to her filing date of December 19, 2011. Tr. at 40.

rotation. *Id.* He observed Plaintiff to have decreased strength at of 3/5 in her right hip and an antalgic gait. *Id.* He indicated x-rays showed asymmetry at Plaintiff's right hip joint. *Id.* He referred her to an orthopedist for further evaluation and prescribed Mobic and Lortab. *Id.*

On January 4, 2011, Plaintiff presented to orthopedic surgeon James N. Rentz, M.D. ("Dr. Rentz"), for right hip pain. Tr. at 371. Dr. Rentz observed that Plaintiff ambulated with a slight limp and complained of pain with ROM of the right hip. Tr. at 372. He noted Plaintiff's x-rays showed flattening and sclerosis at the femoral head and narrowing of the joint space. *Id.* He diagnosed avascular necrosis of the right hip. *Id.* He prescribed a cane and instructed Plaintiff to take over-the-counter medications. *Id.* He recommended Plaintiff proceed with right total hip replacement "when her pain gets to the point where she can no longer handle it." *Id.*

Plaintiff followed up with Dr. Ashe for surgical clearance on January 14, 2011. Tr. at 309. Dr. Ashe observed Plaintiff to have positive tenderness with flexion, internal rotation, and external rotation of her right hip and to have 3/5 right hip strength. Tr. at 310. He indicated Plaintiff had a normal electrocardiogram ("EKG") and physical examination and would be cleared for total right hip replacement. *Id.*

On February 7, 2011, Dr. Rentz explained that Plaintiff's x-rays were consistent with collapse of the femoral head and stage three avascular necrosis. Tr. at 369. Plaintiff elected to proceed with right total hip replacement. Tr. at 368.

On February 17, 2011, Plaintiff presented to Catawba Mental Health Center for an initial clinical assessment. Tr. at 393–96. Therapist Jean M. Boyd, M. Ed. ("Ms. Boyd"),

observed Plaintiff to appear neat and clean; to have lethargic motor activity; to complain of feeling tired all the time; to have an irritable and withdrawn attitude; to demonstrate a flat and blunted affect; to have a depressed and angry mood; to speak with a normal rate and tone; to show a disorganized thought process; to endorse panic attacks and phobias that included fear of crowds, driving, and coworkers; to endorse auditory and visual hallucinations; to deny delusions; to be oriented to person, place, time, and situation; to demonstrate poor personal decision making; to acknowledge, but fail to understand her problems; to have intact memory; to be easily distracted; and to demonstrate an average fund of knowledge. Tr. at 395–96. Ms. Boyd assessed a Global Assessment of Functioning ("GAF")[2] score of 55. Tr. at 396.

Plaintiff was admitted to Piedmont Medical Center for right total hip arthroplasty on March 10, 2011. Tr. at 411. Dr. Rentz performed the surgery, and Plaintiff had no complications. *Id.* Plaintiff was released from the hospital on March 13, 2011, with home health to aid in her care and instructions to bear weight as tolerated with a walker. *Id.*

Plaintiff presented to Piedmont Medical Center on April 14, 2011, after falling over her walker and injuring her right leg. Tr. at 437. She was diagnosed with a periprosthetic right proximal femur fracture around her femoral stem. *Id.* She was hospitalized overnight for pain control and discharged with a wheelchair. Tr. at 436.

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

Plaintiff followed up with Dr. Rentz on April 27, 2011. Tr. at 363. She reported constant pain in her right upper leg. *Id.* Dr. Rentz prescribed Percocet and instructed Plaintiff to avoid weight bearing and to follow up in six weeks. Tr. at 364 and 365.

Plaintiff reported decreased pain in her right leg on May 23, 2011. Tr. at 362. Dr. Rentz indicated she was ambulating well with her walker. *Id.* He instructed her to continue partial weight bearing and to follow up in one month. *Id.*

On May 31, 2011, Plaintiff complained of a lack of energy and motivation. Tr. at 391. Ms. Boyd noted that Plaintiff had a flat and depressed affect. *Id.* She indicated Plaintiff had made limited progress because she continued to isolate and to have angry and sarcastic moods. *Id.*

Plaintiff complained to Dr. Ashe of decreased appetite and leg pain on June 3, 2011. Tr. at 306. Dr. Ashe observed her to be ambulating with a rolling walker, but to demonstrate no other abnormalities. *Id.* He stated Plaintiff's reduced appetite was a likely side effect of her prescribed medications and indicated her depression was stable. *Id.*

Plaintiff complained to Dr. Gay of multiple stressors on June 6, 2011. Tr. at 386–87. She reported continued grief over the death of her husband eight years earlier. Tr. at 387. She indicated she had experienced panic attacks, fear of crowds, and job loss as a result of anxiety. *Id.* She reported depression, anger, and irritability. *Id.* Dr. Gay contacted Plaintiff's pharmacy and was informed that Plaintiff last had her prescriptions for Effexor and Abilify filled in September and October. *Id.* Dr. Gay confronted Plaintiff with this information, and Plaintiff admitted that she was not taking her medications as prescribed. *Id.* Dr. Gay indicated Plaintiff's concentration was distracted and her mood

5

was depressed, irritable, and frustrated. Tr. at 388. He observed Plaintiff to have fair eye contact, an apathetic attitude, motor retardation, a depressed and irritable mood, and a flat affect. Tr. at 388–89. Dr. Gay instructed Plaintiff to stop taking Abilify and to take Remeron for depression, poor sleep and appetite, and anxiety. Tr. at 389. He assessed a GAF score of 50. Tr. at 386.

On June 24, 2011, Dr. Rentz indicated Plaintiff's right femur fracture had healed. Tr. at 361. He instructed her to bear weight as tolerated, but to continue to use her walker. *Id.* Plaintiff followed up with Dr. Rentz for right upper leg pain on July 14, 2011. Tr. at 359. She indicated she was doing better, but continued to experience weakness and fatigue when she attempted to walk. *Id.* Dr. Rentz indicated Plaintiff's complaints were normal and that she should continue to bear weight as tolerated. *Id.*

On July 14, 2011, Plaintiff reported some improvement with her new medication. Tr. at 390. She indicated to Ms. Boyd that she continued to worry about financial stressors and to experience pain, but that she did not feel as nervous and agitated. *Id.* Plaintiff attended a group therapy session on August 18, 2011, but Ms. Boyd indicated she spoke only when asked direct questions and appeared to be very distraught. Tr. at 657. Ms. Boyd noted that the other group members made efforts to get Plaintiff to engage and offered potential solutions to her financial problems. *Id.* On August 19, 2011, Plaintiff reported poor sleep and Ms. Boyd noted she was very thin. Tr. at 385. Ms. Boyd encouraged Plaintiff to follow up with Dr. Rentz and her case manager at vocational rehabilitation. *Id.* On August 25 and September 1, 2011, Ms. Boyd indicated Plaintiff was unable to maintain eye contact and appeared to be anxious and depressed during the

group therapy sessions. Tr. at 655 and 656. She observed that Plaintiff did not volunteer feedback and was mostly quiet. *Id.* She also noted Plaintiff was extremely thin and did not appear to be well-nourished. *Id.* Plaintiff participated in a group therapy session on September 8, 2011. Tr. at 654. She got along well with peers and offered feedback. *Id.* Ms. Boyd indicated Plaintiff maintained her usual flat, depressed affect. *Id.*

Plaintiff complained of left hip pain on September 15, 2011. Tr. at 356. She stated she had developed the pain after sustaining a fall three weeks earlier. *Id.* Dr. Rentz observed Plaintiff to have mild discomfort with flexion, extension, and rotation of the left hip, but indicated the x-rays showed no abnormalities. Tr. at 358. He diagnosed a left hip strain. *Id.*

Plaintiff presented to Ms. Boyd for a therapy session on September 23, 2011. Tr. at 384. She complained of sleep disturbance, ruminative worry, financial distress, and feelings of low self-worth. *Id.* Ms. Boyd encouraged Plaintiff to maintain her sleep, avoid skipping meals, and improve her self-care. *Id.* Plaintiff presented for a group therapy session on September 29, 2011. Tr. at 653. She was unwilling to volunteer information, but did participate in an exercise with a partner. *Id.*

Plaintiff followed up with Dr. Ashe on October 4, 2011. Tr. at 302. She complained of throbbing pain in her left leg that was worsened by standing, walking, and lying on her left side. *Id.* Dr. Ashe observed no abnormalities on examination and suggested Plaintiff's left leg pain was possibly the result of claudication from peripheral vascular disease. *Id.* He referred her for lower extremity arterial studies. *Id.*

Plaintiff attended a group therapy session on October 6, 2011. Tr. at 652. Ms. Boyd indicated she got along well with peers and appeared to understand the topics, but was withdrawn from the group and declined to provide feedback. *Id.*

On October 13, 2011, Plaintiff complained of depression and feeling alone, despite the fact that her son was in the house. Tr. at 381. She indicated she felt like her symptoms had improved on Effexor XR and requested that it be prescribed again. *Id.* Dr. Gay indicated Plaintiff's concentration was distracted and that she experienced ruminative thoughts, muscle tension, and agoraphobia. Tr. at 381–82. Plaintiff demonstrated fair eye contact, loud speech, irritable and depressed mood, and motor agitation. Tr. at 382. Dr. Gay assessed a GAF score of 50. Tr. at 380.

On October 14, 2011, Plaintiff reported to Ms. Boyd that she continued to isolate and to cut off visits with her family members. Tr. at 377. She complained of poor sleep and appetite and feeling sick and tired. *Id.* She indicated she consumed two 12-ounce beers on two to three days per week. *Id.* Ms. Boyd cautioned her about using alcohol and encouraged her to engage in self-care and follow healthy habits. *Id.* Plaintiff actively participated and got along well with peers during group therapy sessions on October 20 and 27, 2011. Tr. at 650 and 651. Ms. Boyd indicated Plaintiff showed improvement in her stress management skills, but continued to have difficulty with her mood and depressive symptoms. Tr. at 650. Plaintiff participated in a group therapy session on November 3, 2011. Tr. at 649. Ms. Boyd indicated Plaintiff was initially withdrawn, easily agitated, angry, irritated, and reluctant to participate, but later provided feedback and got along well with peers. *Id.*

Ms. Boyd saw Plaintiff on an emergency basis on November 10, 2011, after Plaintiff had threatened to kill her family members and was extremely distraught, angry, and tearful. Tr. at 378. While Ms. Boyd was attempting to obtain a bed for Plaintiff at an inpatient facility, Plaintiff left the clinic with a friend. *Id.* Ms. Boyd contacted the police and signed an order of detention. *Id.* Plaintiff indicated she would turn herself in, but failed to do so. *Id.* Ms. Boyd noted Plaintiff appeared to be regressing and may be using alcohol or drugs. *Id.*

Plaintiff followed up with Dr. Rentz for left hip pain on December 29, 2011. Tr. at 354. She stated her pain was so severe that she was unable to walk or rest. *Id.* Plaintiff complained of pain with motion of her left hip. *Id.* X-rays showed a collapse of the femoral head that was consistent with avascular necrosis. *Id.* Dr. Rentz informed Plaintiff that the only option for treatment was to undergo left hip replacement. *Id.*

On January 10, 2012, Ms. Boyd noted that Plaintiff had a "flat, moderately depressed, apathetic mood/attitude." Tr. at 376. Plaintiff informed Ms. Boyd that she had attended vocational rehabilitation for four weeks, but that she was informed that they would be unable to find a job for her. *Id.* Plaintiff claimed she was taking her medications, but Ms. Boyd concluded that she had not been taking her medications properly because she would have required refills. *Id.* Plaintiff became visibly angry and agitated when Ms. Boyd questioned her about her alcohol use. *Id.* Ms. Boyd noted that Plaintiff had come into the office smelling of alcohol and often underreported her alcohol use. *Id.* She noted "Pt. appears to continue to use Alcohol and possible crack/meth use, as

pt. possess signs of extreme agitation, quick tempered, aggression one minute and then passive the next." *Id.*

Plaintiff underwent left hip replacement on January 24, 2012. Tr. at 485. As a result of blood loss, she developed acute anemia and required a blood transfusion. *Id.* She improved and tolerated physical therapy well. *Id.* On January 27, 2012, she was discharged with instructions for home health services. *Id.*

On January 30, 2012, state agency medical consultant Thomas German, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") assessment. Tr. at 83–84. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders/ropes/scaffolds. *Id.* State agency medical consultant William Hopkins, M.D., reviewed the evidence and assessed the same physical RFC on May 7, 2012. Tr. at 99–100.

Dr. Rentz indicated Plaintiff was doing great on February 8, 2012. Tr. at 349. He prescribed Percocet and instructed Plaintiff to continue to participate in physical therapy. *Id.* He indicated she should remain 50% weight bearing until February 20, but could bear weight as tolerated thereafter. *Id.* He recommended Plaintiff continue to use her walker for another month because she sustained a fall after her last surgery. *Id.*

State agency consultant Lisa Clausen, Ph. D. ("Dr. Clausen"), reviewed the medical evidence and completed a psychiatric review technique form ("PRTF") on

February 10, 2012. Tr. at 81–83. She considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and assessed mild restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Clausen indicated Plaintiff was moderately limited with regard to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. Tr. at 85. She stated Plaintiff was "able to understand and remember simple instructions, but may have difficulties understanding more detailed instructions"; was "able to follow simple instructions, but may have difficultie[s] with multi-tasking complex instructions"; "may need occasional reminders when distracted by pain considerations when attending for extended periods of time"; "would work best in an environment with a modicum of social stimulation that is supportive" and in "an environment that avoids ongoing interaction with the public"; and was limited to "simple, unskilled" work with "minimal contact with supervisors, coworkers and the general public." Tr. at 85–86.

On February 15, 2012, Dr. Rentz provided Plaintiff an excuse to remain out of work from January 24, 2012, through May 21, 2012. Tr. at 348. Plaintiff presented to Dr. Rentz on February 23, 2012, after having fallen the day before. Tr. at 347. Dr. Rentz observed Plaintiff to have no swelling or bruising and to be walking well with her walker. *Id.* He diagnosed a contusion, but indicated Plaintiff had not damaged her hip. *Id.* He instructed her to continue to bear weight as tolerated and to use a walker as needed. *Id.*

Plaintiff presented to psychiatrist Felicitas Bugarin, M.D. ("Dr. Bugarin"), on March 21, 2012. Tr. at 464–65. She indicated she continued to grieve her husband and to feel guilty for his death. Tr. at 464. She stated she felt tired all the time and tended to isolate from others and avoid social activities. *Id.* Dr. Bugarin assessed a GAF score of 55. Tr. at 465.

On March 25, 2012, Plaintiff indicated that she felt depressed and desired to isolate and withdraw from others. Tr. at 648. Ms. Boyd noted that Plaintiff was unwilling to volunteer any information and appeared tired throughout the session. *Id.*

On March 27, 2012, Plaintiff requested medication to increase her appetite and complained of a shooting pain from her left leg to her ankle. Tr. at 300. She was ambulating with a walker. Tr. at 301. Drewid Plyler, PA-C ("Mr. Plyler"), prescribed medication to treat an H. pylori infection. Tr. at 300. Plaintiff followed up with Mr. Plyler on April 9, 2012. Tr. at 298. She reported weakness, nausea, and weight loss. *Id.* Mr. Plyler noted Plaintiff's blood sugar was increased and referred her for an A1c test. *Id.* He discontinued Pravastatin and prescribed 50,000 units of Vitamin D and Livalo. *Id.*

On April 30, 2012, Plaintiff complained of pain and swelling in her left hip and leg. Tr. at 345. Dr. Rentz observed Plaintiff to have good ROM of her hips and knees and no swelling or edema. *Id.* He indicated x-rays of Plaintiff's bilateral hips were normal. *Id.* He prescribed Ultram and told Plaintiff that her complaints were normal and that she just needed more time to improve. *Id.*

State agency consultant Jeanne Wright, Ph. D. ("Dr. Wright"), reviewed the record and completed a PRTF on May 7, 2012. Tr. at 96–98. She considered Listings 12.04 and

12.06 and determined Plaintiff had mild restriction of ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 96. She found that Plaintiff had moderate limitation in the same areas indicated by Dr. Clausen. Tr. at 101–02. Dr. Wright stated Plaintiff "would work best in an environment with a modicum of social stimulation that is supportive" and in "an environment that avoids ongoing interaction with the public." Tr. at 102. She further indicated Plaintiff was "limited to simple, unskilled" work with "minimal contact with supervisors, coworkers and the general public." *Id.*

On June 6, 2012, Plaintiff informed Ms. Boyd that she felt better than she had in a while. Tr. at 647. She indicated her sleep and appetite continued to be poor, but stated she had decided not to worry. *Id.* Ms. Boyd noted Plaintiff appeared more relaxed and endorsed less anxiety and worry. *Id.*

Plaintiff returned to Dr. Rentz for left hip pain on July 5, 2012. Tr. at 622–23. Dr. Rentz diagnosed greater trochanteric bursitis of the left hip and administered a Depo-Medrol and Marcaine injection. Tr. at 622.

Plaintiff complained of swelling in her bilateral legs on July 12, 2012. Tr. at 573–74. Mr. Plyler instructed her to elevate her legs and to use compression stockings. Tr. at 573.

Plaintiff followed up with Dr. Bugarin on July 27, 2012, and reported anger and irritability. Tr. at 598. Dr. Bugarin stated Plaintiff became very agitated when she was asked questions. *Id.* She assessed a GAF score of 55. Tr. at 599.

Plaintiff complained of feeling tired and depressed on October 12, 2012. Tr. at 644. She indicated to Ms. Boyd that she had attempted suicide in the past by drinking, taking pills, and cutting her wrist. *Id.* However, she indicated she had no current suicidal plan or intent. *Id.* On November 2, 2012, Plaintiff complained of poor sleep, lack of appetite, low energy, lack of motivation, and self-isolation. Tr. at 643. Ms. Boyd noted that Plaintiff presented as "very apathetic, passive and agitated" during the session. *Id.*

On November 8, 2012, Plaintiff complained of a burning sensation on her left posterior thigh and a constant stabbing pain in her left side. Tr. at 571. Mr. Plyler assessed sciatica, Vitamin D deficiency, and hyperlipidemia. *Id.*

On November 14, 2012, Dr. Bugarin observed that Plaintiff looked good and appeared to have gained some weight. Tr. at 596. Plaintiff complained of poor sleep, and Dr. Bugarin increased her dose of Trazodone. *Id.* Dr. Bugarin assessed a GAF score of 55. Tr. at 597.

Plaintiff participated in physical therapy at Chester Regional Medical Center from August 7, 2012, through December 5, 2012. Tr. at 505–58. On December 5, 2012, her physical therapist noted she was able to ambulate with her cane and turn around without holding on. Tr. at 507. He stated Plaintiff was doing well and would be ready for discharge once she became a little more comfortable while walking with her cane. *Id.*

On December 14, 2012, Plaintiff reported to Ms. Boyd that her uncle had recently passed away and that she was having difficulty dealing with her grief and interacting with family members. Tr. at 642. Ms. Boyd observed Plaintiff to be highly agitated, angry, and depressed. *Id.* On January 11, 2013, Plaintiff reported multiple stressors related to her

sons and her financial situation. Tr. at 641. Ms. Boyd noted that Plaintiff appeared sad and depressed. *Id.*

Plaintiff reported improved mood when she followed up with Dr. Bugarin on February 8, 2013. Tr. at 593–94. Dr. Bugarin assessed a GAF score of 55. Tr. at 595. Plaintiff continued to report isolative behavior to Ms. Boyd, and Ms. Boyd encouraged her to make an effort to get out of her house on good days. Tr. at 640.

On February 12, 2013, Plaintiff complained to Mr. Plyler of pain in her right foot and left knee and leg. Tr. at 569. Mr. Plyler assessed lumbar spondylosis and left-sided radiculopathy, constipation, osteoporosis, and osteoarthritis. *Id.* An x-ray of Plaintiff's lumbar spine showed probable spinal stenosis and decreased disc space at L5-S1. Tr. at 576.

Plaintiff complained of financial and family stressors on March 1, 2013. Tr. at 639. Ms. Boyd indicated Plaintiff had a flat and depressed affect. *Id.* She encouraged Plaintiff to take her psychiatric medications as prescribed. *Id.* On March 15, 2013, Plaintiff reported continued depression, but a decrease in anxiety attacks. Tr. at 638. She indicated she was taking occasional walks and was benefitting from her psychiatric medications. *Id.*

Plaintiff followed up with Dr. Rentz on April 11, 2013. Tr. at 620–21. She complained of pain along the lateral side of her hip and stated she felt like her left leg was shorter than her right leg. Tr. at 620. Dr. Rentz indicated Plaintiff had no clinically-significant difference in her leg lengths and that she had good ROM and no real point tenderness to palpation. *Id.* He assured Plaintiff that no further treatment was required. *Id.*

15

On April 12, 2013, Plaintiff reported to Ms. Boyd that her moods were up and down. Tr. at 637. She indicated she typically stayed in her home and wore her pajamas all day. *Id.* Ms. Boyd observed Plaintiff to have fair hygiene and grooming, but to have poor eye contact. *Id.*

Plaintiff completed a bone mineral density test on April 17, 2012, that showed her to have osteopenia and to be at moderate risk for bone fracture. Tr. at 582.

On May 8, 2013, Plaintiff reported that she felt like many things were going against her. Tr. at 636. Ms. Boyd attempted to engage Plaintiff and to help her focus on the positive things in her life, but Plaintiff tended to withdraw and avoid the subject. *Id.*

Plaintiff presented to Mr. Plyler on May 16, 2013, with complaints of constipation and a request for blood work. Tr. at 566. Mr. Plyler observed Plaintiff to be ambulating with a cane, but noted no other abnormalities. *Id.* He referred Plaintiff for blood work and prescribed Miralax and Vitamin D and B12 supplements. Tr. at 568.

On June 27, 2013, Plaintiff presented to Mr. Plyler with a complaint of intermittent swelling in her feet. Tr. at 562. Mr. Plyler observed Plaintiff to be tender in her left upper quadrant and lower lumbar spine; to have limited ROM in her lumbar spine; to endorse pain with twisting and flexion; to have positive straight-leg raise in her left lower extremity at 45 degrees; and to demonstrate an irregular gait. Tr. at 563–64. Mr. Plyler diagnosed left upper quadrant abdominal pain, constipation, varicose veins of the lower extremities, and hematuria. Tr. at 564. He administered a Ketorolac injection for abdominal pain; prescribed Linzess for constipation and Cipro for hematuria;

instructed Plaintiff to use compression stockings and to elevate her feet for varicose veins; and referred her for blood work and x-rays of her kidneys, ureter, and bladder. *Id.*

Plaintiff presented to psychiatrist Christie D. Williamson, M.D. ("Dr. Williamson"), on July 19, 2013. Tr. at 592. She complained of poor sleep and poor appetite and indicated Effexor was no longer effective. *Id.* Dr. Williamson assessed a GAF score of 64. Tr. at 593. She tapered down Plaintiff's dosage of Effexor and prescribed Cymbalta. *Id.* Plaintiff presented to Ms. Boyd for a therapy session the same day and reported that she had recently threatened her friend with a BB gun because he stated that depression was something that people make up and told her that she could just make herself happy. Tr. at 634. She reported symptoms of panic and anxiety that occurred when she was in crowds and public places. *Id.* She endorsed poor appetite and occasional suicidal thoughts. *Id.*

Plaintiff presented to the ER at Chester Regional Medical Center on August 23, 2013, with complaints of depression and anxiety. Tr. at 587. She was diagnosed with alcohol intoxication. Tr. at 585.

Plaintiff presented to Arthur W. Cooler M.D. ("Dr. Cooler"), on October 6, 2013. Tr. at 603–05. She complained of peripheral edema, varicose veins, joint swelling and stiffness, intermittent claudication, and lymphedema. Tr. at 604. Dr. Cooler referred Plaintiff for a bilateral lower extremity venous ("LEV") study. Tr. at 605.

On October 11, 2013, Plaintiff was transferred to therapist Kimberly Sconyers, M.R.C. ("Ms. Sconyers"), for case management. Tr. at 633. Plaintiff was dressed and groomed appropriately for the appointment and walked easily with her cane. *Id.* She

17

demonstrated a positive, upbeat mood. *Id.* She reported being off her medications because the pharmacy required a prior authorization, but Ms. Sconyers noted that Plaintiff never contacted the clinic to request that her doctor authorize the prescription. *Id.*

On October 21, 2013, Plaintiff reported depression, poor sleep, poor appetite, auditory hallucinations, irritability, and impatience. Tr. at 590. Dr. Williamson noted Plaintiff had been noncompliant with Cymbalta. *Id.* She restarted Plaintiff on Cymbalta and assessed a GAF score of 63. Tr. at 591.

Plaintiff complained of pulling her hair out and being unable to get past her depression on October 25, 2013. Tr. at 619. She was tearful and pulled her hair during the session. *Id.* Ms. Sconyers observed Plaintiff to have a faint smell of alcohol on her breath. *Id.* On November 1, 2013, Ms. Sconyers described Plaintiff as appearing stressed. Tr. at 618. Plaintiff expressed some passive suicidal ideation, and Ms. Sconyers contracted with her for safety. *Id.* Plaintiff's affect brightened by the end of the session, and she indicated she felt much better and hugged Ms. Sconyers. *Id.*

On November 13, 2013, Dr. Cooler noted that the recent LEV study was normal, but ordered complete bilateral noninvasive physiologic arterial studies. Tr. at 600 and 602. He indicated he did not expect that Plaintiff's symptoms had a vascular origin. Tr. at 602. On November 15, 2013, the arterial lower extremity study showed no hemodynamically-significant stenosis and normal perfusion. Tr. at 607.

Ms. Sconyers described Plaintiff as having improved mood and a brighter affect on November 14, 2013. Tr. at 617. Plaintiff indicated she was sleeping well, using

problem-solving techniques, and benefitting from her medications. *Id.* On November 27, 2013, Ms. Sconyers indicated Plaintiff's mood had improved since she started taking Cymbalta. Tr. at 616. Plaintiff denied alcohol use and reported she was trying to stay busy. *Id.* Ms. Sconyers indicated Plaintiff still had some unresolved grief issues that needed to be addressed. *Id.* Plaintiff attended a therapy session with Ms. Sconyers on December 16, 2013. Tr. at 615. She reported improved mood. *Id.* Ms. Sconyers indicated Plaintiff smelled of alcohol, but denied alcohol use. *Id.* On January 2 and 22, 2014, Ms. Sconyers indicated Plaintiff's symptoms continued to improve. Tr. at 613 and 614.

Plaintiff presented to Mr. Plyler on February 18, 2014, with a cough, congestion, and left knee pain. Tr. at 665–66. Mr. Plyler observed no abnormalities on examination. Tr. at 666. He indicated an x-ray of Plaintiff's left knee showed arthritic changes, but no acute problem. *Id.* He diagnosed dyspnea, acute bronchitis, and arthritis. *Id.*

On February 24, 2014, Plaintiff reported to Dr. Williamson that she was grieving the loss of her sister. Tr. at 610. She endorsed low energy and limited motivation. *Id.* She complained that the pharmacy had not processed her prescription for Cymbalta in a timely manner, and she reported an alcohol relapse following her sister's death. *Id.* She indicated she was participating in a knitting class that was helping her to avoid isolation. *Id.* Dr. Williamson noted Plaintiff was neatly dressed, wore a wig, walked with a limp, and ambulated with a cane. *Id.* Plaintiff demonstrated poor eye contact and focused on the negative aspects of her life. *Id.* Dr. Williamson assessed a GAF score of 62. Tr. at 611.

On March 4, 2014, Plaintiff complained to Mr. Plyler of left knee pain and swelling. Tr. at 662. Mr. Plyler observed Plaintiff to have limited ROM with flexion and extension of her left knee and tenderness in the left medial aspect with crepitus and mild swelling. *Id.* He administered an intra-articular injection to Plaintiff's left knee and referred her to an orthopedist. Tr. at 663.

Plaintiff met with Ms. Sconyers on March 5, 2014, to discuss grief and anger over the deaths of her husband and sister. Tr. at 612. They discussed Plaintiff's use of knitting as a coping mechanism. *Id.* Ms. Sconyers indicated Plaintiff was improving. *Id.*

Plaintiff presented to Niraj Kalore, M.D. ("Dr. Kalore"), with left knee pain and swelling on March 10, 2014. Tr. at 683–84. Dr. Kalore observed Plaintiff to ambulate with an antalgic gait, but without an assistive device. Tr. at 685. He observed swelling, genu varum deformity, tenderness to palpation, crepitus, and pain with ROM in Plaintiff's left knee. *Id.* He noted a two centimeter discrepancy in Plaintiff's leg length and observed her left hip to be higher than her right. *Id.* Plaintiff demonstrated tenderness and decreased ROM in her hips. *Id.* Dr. Kalore referred Plaintiff for magnetic resonance imaging ("MRI") of her left knee. Tr. at 686. On March 26, 2014, Plaintiff followed up with Dr. Kalore for her MRI results. Tr. at 678–79. Dr. Kalore diagnosed Plaintiff with a lateral meniscus tear and recommended left knee arthroscopic surgery with partial lateral meniscectomy. *Id.* Plaintiff presented to Dr. Kalore on March 28, 2014, after slamming her left index finger in a car door. Tr. at 671–72. An x-ray indicated a fracture of the phalanx of Plaintiff's left index finger. Tr. at 673. On April 22, 2014, Dr. Kalore performed a left knee arthroscopy with lateral meniscectomy. Tr. at 695. Plaintiff

attended physical therapy and was ambulating with a cane by May 29, 2014. Tr. at 710–11.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on March 19, 2014, Plaintiff testified she had difficulty keeping up with the pace required in her former job. Tr. at 43–44. She indicated she experienced symptoms of depression and mood swings. Tr. at 44. She stated she briefly attempted to obtain work through the vocational rehabilitation office, but was released because she required another surgery on her right leg, nearly fell, and would be difficult to place based on her insignificant work history. Tr. at 41.

Plaintiff testified she had threatened to kill her therapist during a period when she was unable to receive her medications and was using alcohol. Tr. at 44–46. She stated she had also threatened to shoot a friend with a BB gun. Tr. at 68. She indicated she no longer felt motivated to engage in activities she did before her husband passed away. Tr. at 47. She stated she had "the best looking yard" on her street at one time, but had allowed her house to fall apart. *Id.* She indicated she felt like hurting herself and others. *Id.* She stated she pulled her hair out when she was feeling anxious. Tr. at 51. She indicated her doctor had prescribed medication to increase her appetite because she was often unmotivated to eat. Tr. at 71.

Plaintiff testified she had undergone hip replacement surgery in March 2011. Tr. at 47. She stated she was confined to a wheelchair after she fell and broke her right femur

the next month. *Id.* She indicated she underwent left hip surgery in January 2012. Tr. at 48. She stated she subsequently experienced swelling in her feet and knees and a shooting pain in her legs. *Id.* She indicated she had difficulty with balance and used a walker and a cane to ambulate. Tr. at 50. However, she stated she was able to move through her house without an assistive device. Tr. at 70.

Plaintiff testified her doctors told her to elevate her legs, to apply ice, and to remain off her feet for 15 minutes at a time. Tr. at 49. She stated her doctor had prescribed pain medication, muscle relaxers, and physical therapy, but indicated her symptoms had not improved. Tr. at 50. She stated the orthopedist had recommended she obtain an MRI. *Id.*

Plaintiff testified her therapist had referred her to group therapy in an effort to improve her ability to interact with others. Tr. at 51. She indicated she had attended two group sessions per week for two weeks. Tr. at 52–53. She stated she had difficulty trusting people because she had been raped after her husband's death. Tr. at 51.

Plaintiff testified she could sit for 30 minutes to an hour at a time, but indicated her legs and feet would swell or her leg would go out if she sat for too long. Tr. at 54–55. She stated she could lift a case of soda. Tr. at 69.

Plaintiff testified she sometimes used alcohol to reduce her pain, but was unable to pinpoint how often or how much she drank. Tr. at 56–60. She indicated she took her medications as prescribed, except on occasions when she had difficulty obtaining the medication through Medicaid. Tr. at 63–64.

Plaintiff testified she occasionally attended church and her pastor sometimes visited her in her home. Tr. at 53–54. She indicated she had difficulty performing household chores because of her standing limitations. Tr. at 54. She denied getting up and dressing on a daily basis and stated she often stayed in bed. Tr. at 55. She stated she typically watched television, performed some household chores, telephoned family members, prepared lunch, practiced knitting, read, and used her son's computer during the day. Tr. at 64–66 and 69. She indicated her friends occasionally visited her. Tr. at 66–67. She stated she sometimes shopped for groceries with a friend. Tr. at 68.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Janette Clifford reviewed the record and testified at the hearing. Tr. at 71–75. The VE categorized Plaintiff's PRW as a fast food worker, *Dictionary of Occupational Titles* ("*DOT*") number 311.472-010, as light with a specific vocational preparation ("SVP") of two and a marker/labeler, *DOT* number 920.687-126, as light with an SVP of two. Tr. at 72. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required frequent climbing of ramps and stairs, balancing, and stooping; less than occasional kneeling, crouching and crawling; and no climbing of ladders, ropes, or scaffolds or work at unprotected heights or around dangerous machinery. Tr. at 72–73. She asked the VE to further assume the individual was limited to simple, routine tasks in a job that required no more than occasional contact with the public. Tr. at 73. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a marker/labeler. *Id.* The ALJ asked the VE to further assume the individual would need a job that required only

23

occasional contact with supervisors and coworkers. *Id.* The VE testified the individual could perform Plaintiff's PRW as a marker/labeler with the additional limitations. *Id.* The ALJ asked the VE to identify other jobs that could be performed with those restrictions. *Id.* The VE identified light jobs as a sorter, *DOT* number 521.687-102, with 1,790 positions in South Carolina and 150,776 positions in the national economy; a folder, *DOT* number 369.687-018, with 1,338 positions in South Carolina and 185,254 positions in the national economy; and a linen grader, *DOT* number 361.687-022, with 1,023 positions in South Carolina and 187,103 positions in the national economy. Tr. at 73 and 74.

The ALJ next asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited to sedentary work with the additional restrictions identified in the first hypothetical question. Tr. at 73–74. She asked if the individual could perform any jobs. *Id.* The VE identified jobs as an assembler, *DOT* number 725.687-022, with 1,231 positions in South Carolina and 153,888 positions in the national economy; a lens inserter, *DOT* number 713.687-026, with 1,414 positions in South Carolina and 160,815 positions in the national economy; and an inspector, *DOT* number 669.687-014, with 1,330 positions in South Carolina and 130,317 positions in the national economy. Tr. at 74.

Plaintiff's representative asked the VE to assume the hypothetical individual would be off task during 10 percent of the workday as a result of anxiety. *Id.* She asked if the individual would be able to engage in sustained work. *Id.* The VE stated that employers would typically expect an employee to be off task for no more than 10 percent of the workday. Tr. at 75. Plaintiff's representative asked the VE to assume the individual

24

would be off task 15 percent of the time. *Id.* The VE indicated that an individual who was off task 15 percent of the time would be unable to meet work demands. *Id.* Plaintiff's representative asked the VE to assume the individual would be absent from work twice a month as a result of pain and mental illness. *Id.* She asked whether the individual would be able to engage in sustained work. *Id.* The VE responded that most employers would not tolerate two to three absences per month. *Id.*

2.    The ALJ's Findings

In her decision dated May 27, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since December 19, 2011, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: depressive disorder, anxiety disorder, bilateral venous insufficiency and status post bilateral total hip arthroplasty (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she is limited to frequent ramp and/or stair climbing, balancing, and stooping; occasional kneeling, crouching and crawling on a less than an occasional basis. The claimant is also precluded from climbing ladders, ropes and scaffolds and work at unprotected heights or around dangerous machinery. Furthermore, the claimant is limited to performing simple, routine tasks in a job that requires no more than occasional contact with the public.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on March 16, 1966 and was 45 years old, which is defined as a younger individual age 18–44, on the date the application was filed. The claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since December 19, 2011, the date the application was filed (20 CFR 416.920(g)).

Tr. at 18–28.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not comply with the requirements of Social Security Ruling ("SSR") 96-8p in assessing Plaintiff's mental RFC;

2)    the ALJ failed to include all of Plaintiff's limitations in the assessed RFC and did not adequately explain the assessed RFC; and

3)    the ALJ did not explain her finding regarding Plaintiff's credibility in accordance with the requirements of SSR 96-7p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

26

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); SSR 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Plaintiff's Mental RFC

Plaintiff argues the ALJ neglected to assess her mental limitations on a function-by-function basis. [ECF No. 18 at 10]. She maintains the ALJ assessed an RFC that failed to address the implications of moderate limitations in ADLs, social functioning, and concentration, persistence, or pace on her ability to perform specific work-related mental

functions. *Id.* at 11–12. She contends the ALJ provided inadequate reasons for rejecting the state agency consultant's opinion that she would be moderately impaired in her ability to accept instructions and respond appropriately to criticism from supervisors. *Id.* at 15–16. She argues the ALJ did not adequately address her moderate limitations in concentration, persistence, or pace by limiting her to simple, routine tasks. *Id.* at 17. She maintains the ALJ was required to address her ability to stay on task. [ECF No. 21 at 1].

The Commissioner argues the ALJ "discussed the medical evidence with attention to Plaintiff's functional abilities in terms of work related mental functioning." [ECF No. 20 at 17]. She maintains the ALJ cited specific records that supported the mental limitations included in the assessed RFC. *Id.* at 17–18.

If a claimant alleges she is disabled as a result of a mental impairment, the ALJ should first evaluate the claimant's symptoms to determine if she has a medically-determinable mental impairment and then assess the degree of functional limitation imposed by the impairment. 20 C.F.R. § 416.920a(b). The ALJ must consider the four functional areas of ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). If the ALJ determines the claimant has a severe mental impairment, but finds that her functional limitations are not severe enough to meet or equal a Listing, the ALJ should consider the claimant's mental functional limitations as part of the RFC assessment. 20 C.F.R. § 416.920a(d)(3). She must ascertain the limitations imposed by the claimant's impairments and determine the claimant's work-related abilities on a function-by-function basis. SSR 96-8p. This typically requires that the ALJ consider the claimant's ability to sustain work-related

activities over an eight-hour day and five-day work week or an equivalent work schedule. *Id.*

In *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), the court determined the ALJ erred in assessing the plaintiff's RFC. Pertinent to Plaintiff's argument, the court stated "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638. It accepted the plaintiff's argument that "the ability to perform simple tasks differs from the ability to stay on task" and acknowledged that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* The court recognized that, on remand "the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work . . . [b]ut because the ALJ here gave no explanation, a remand is in order." *Id.* Thus, the court stressed the requirement for ALJs to translate impairments in functional areas into meaningful functional limitations in hypothetical questions presented to VEs and RFC assessments.

This court has interpreted the Fourth Circuit's decision in *Mascio* as requiring remand "when: 1) a finding of mental limitation in concentration, persistence, or pace is not reflected in the RFC; 2) the mental limitation was not incorporated in the hypothetical given to the VE; and 3) the ALJ did not sufficiently explain the exclusion of such mental limitation." *Wilson v. Colvin*, No. 2:14-3209-TLW-MGB, 2016 WL 625088, at *4 (D.S.C. Jan. 15, 2016), adopted by 2016 WL 613891 (D.S.C. Feb. 16, 2016). In several recent cases, the court has held that an ALJ adequately accounts for moderate limitations

31

in concentration, persistence, or pace by explaining how this functional limitation was considered as part of the RFC assessment. *See Davis v. Colvin*, No. 0:14-4314-TMC-PJG, 2015 WL 7871172, at \*4 (D.S.C. Dec. 4, 2015) ("As discussed above and contrary to the *Mascio* case, the ALJ accounted for Davis's limitations and credibility in determining her RFC prior to proceeding to steps four and five. Further, the ALJ found that any limitation in Davis's concentration, persistence, or pace did not affect her ability to perform simple, routine, repetitive tasks."); *Falls v. Colvin*, No. 8:14-195-RBH, 2015 WL 5797751, at \*7 (D.S.C. Sept. 29, 2015) ("As opposed to the hypothetical in *Mascio*, which said nothing about the claimant's mental limitations, the ALJ's hypothetical in this case accounted for each of Plaintiff's mental limitations. The ALJ also accounted for Plaintiff's limitations in the area of concentration when determining Plaintiff's residual functional capacity. The ALJ noted Plaintiff's mental limitations but found that the Plaintiff could 'concentrate, persist and work at pace to do simple, routine, repetitive work at 1–2 step instructions for extended periods say 2-hour periods in an 8-hour day.'"); *Gilbert v. Colvin*, No. 2:14-981-MGL-MGB, 2015 WL 5009225, at \*14 (D.S.C. Aug. 19, 2015) ("In *Mascio*, the ALJ concluded the plaintiff had a moderate limitation in concentration, persistence, or pace but did not include any corresponding limitation in the plaintiff's RFC, nor did the ALJ explain the reasons for not including such a limitation. In the case *sub judice*, however, the ALJ limited Plaintiff to 'simple work,' specifically relying on Dr. Boland's assessment that despite Plaintiff's 'difficulty sustaining her concentration and pace on complex tasks,' Plaintiff 'should be able to . . . perform simple tasks without special supervision.'").

Unlike the ALJ in *Mascio*, here, the ALJ included mental limitations in the hypothetical questions posed to the VE. *See* Tr. at 72–74. Her decision reflects her application of the special technique outlined in 20 C.F.R. § 416.920a, in finding that Plaintiff had severe impairments that included depressive disorder and anxiety disorder and in assessing the degree of functional limitation imposed by those impairments. Tr. at 19. The ALJ determined that Plaintiff had moderate restriction in ADLs, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. *Id.* As a result of Plaintiff's mental impairments, the ALJ included in the assessed RFC restrictions to simple, routine tasks in a job that required no more than occasional contact with the public. Tr. at 20. She stated that she adopted Dr. Wright's opinion that Plaintiff could "do simple, unskilled work with minimal contact with the general public," but rejected the part of her opinion that addressed Plaintiff's ability to interact with coworkers and supervisors "based on her mental health records, which show that the claimant interacts well with her therapists" and her testimony "that she takes a knitting class and attends church, which are circumstantial indicators that the claimant would be able to interact appropriately with at least supervisors and co-workers." Tr. at 26.

Although the ALJ included mental limitations in her hypothetical questions to the VE and in the assessed RFC and provided some explanation of the mental limitations she imposed, her explanation does not reflect adequate consideration of the functional limitations imposed by moderate difficulties in social functioning and concentration, persistence, or pace. The ALJ's explanation of the assessed RFC is more thorough than

that rejected by the court in *Mascio* in that she explained she based it, in part, on Dr. Wright's opinion. *See* Tr. at 26. Dr. Wright, like the ALJ, found that Plaintiff had moderate limitations in concentration, persistence, or pace and concluded that her symptoms and impairments "would not preclude the performance of simple, repetitive work tasks in a setting that does not require ongoing interaction with the public." *Compare* Tr. at 96–98, *with* Tr. at 26. However, Dr. Wright completed a more thorough mental RFC assessment that addressed the limitations imposed by Plaintiff's moderate difficulties in social functioning and concentration, persistence, or pace in terms of specific functions, and the ALJ neglected to address some of the functional limitations Dr. Wright identified. *See* Tr. at 100–02.

Dr. Wright noted Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods and indicated she "may need occasional reminders when distracted by pain considerations when attending for extended periods of time." Tr. at 101. This was a specific limitation that pertained to Plaintiff's ability to stay on task, and it was not addressed by the ALJ's inclusion in the RFC of a provision for only simple, repetitive work. The ALJ declined to address this limitation or to include a provision for additional reminders when attending to tasks for extended periods in the hypothetical to the VE or the assessed RFC.

While she provided an explanation for rejecting Dr. Wright's opinion that Plaintiff would require minimal contact with supervisors and coworkers, the ALJ neglected to address Dr. Wright's assessment that Plaintiff "would work best in an environment with a modicum of social stimulation that is supportive" because of her moderately limited

34

ability to accept instructions and respond appropriately to criticism from supervisors. Tr. at 101–02. The ALJ cited Plaintiff's ability to interact with her therapists and with others in a knitting class and at church. Tr. at 26. However, these are generally considered to be supportive environments, and Plaintiff's ability to function in them does not undermine Dr. Wright's assertion that she would function best in a work environment with supportive social stimulation.

Because the ALJ indicated she was adopting Dr. Wright's opinion, but failed to incorporate or reject some of the functional limitations identified by Dr. Wright in the hypothetical to the VE and the assessed RFC, the undersigned recommends the court find she did not appropriately consider Plaintiff's moderate difficulties in social functioning and concentration, persistence, or pace on a function-by-function basis.

2.      General RFC Assessment

Plaintiff argues the ALJ failed to include limitations that were supported by the record in the RFC and neglected to explain her reasons for excluding those limitations. [ECF No. 18 at 19–24]. She maintains the ALJ erred in failing to assess her ability to perform work-related functions for a full workday. [ECF No. 21 at 2].

The Commissioner argues the ALJ thoroughly discussed all of the relevant evidence in explaining the assessed RFC. [ECF No. 20 at 14–15]. She maintains the ALJ cited specific records to support her RFC finding. *Id.* at 15.

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The

ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Plaintiff asserts the ALJ specifically erred in assessing her RFC as it pertained to use of an assistive device to ambulate and GAF scores. Therefore, the undersigned addresses each of these in turn.

> a.     Use of Assistive Device

Plaintiff argues the ALJ erroneously concluded that she ambulated normally, despite evidence that she required a walker and a cane for balance and ambulation. [ECF No. 18 at 20]. The Commissioner maintains the ALJ explicitly referenced Plaintiff's use

of a cane and walker and considered them in limiting her to sedentary work with additional postural limitations. [ECF No. 20 at 16].

> Sedentary work is described in SSR 96-9p as follows:
>
> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.

The ALJ acknowledged Plaintiff's testimony that she required a walker or cane to ambulate, but concluded that her most recent medical records showed her to be ambulating normally. Tr. at 23. She indicated there was no evidence that Plaintiff's impairments resulted in an inability to ambulate effectively. Tr. at 25.

In light of the ALJ's unambiguous statement that Plaintiff's impairments did not result in an inability to ambulate effectively, the undersigned rejects the Commissioner's argument that the ALJ accommodated Plaintiff's need for an assistive device in limiting her to sedentary work. Plaintiff had several impairments that affected her ability to ambulate, including a history of bilateral hip arthroplasty, bilateral venous insufficiency, and left knee osteoarthritis and meniscus tear. Tr. at 411, 484, 564, and 678–79. The record reflects that Plaintiff was prescribed a cane on January 4, 2011. Tr. at 372. Although the ALJ cited a March 2014 record from Mr. Plyler that indicated Plaintiff was "ambulating normally," Tr. at 662, that one treatment note was undermined by numerous references to Plaintiff having an abnormal gait or ambulating with an assistive device.

*See* Tr. at 301 (noted to be ambulating with walker on March 27, 2012), 306 ("ambulating via a rolling walker" on June 3, 2011), 314 ("[p]ositive antalgic gait" on December 29, 2010), 347 ("is walking well with a walker" on February 23, 2012), 349 ("on February the 20th she can go to weightbearing as tolerated but should probably use her walker at least for another month after that" on February 8, 2012),  361 ("told her to still use the walker until I see her back in a month to re x-ray" on June 24, 2011), 362 ("ambulating well with her walker" on May 23, 2011), 411 ("weightbearing as tolerated right lower extremity with a walker" on March 13, 2011), 507 ("able to ambulate with her cane" on December 5, 2012), 564 ("irregular gait" on June 27, 2013), 566 ("is walking with a cane" on May 16, 2013), 610 ("walks w limp and cane" on February 24, 2014), 633 ("walked easily with her cane" on October 11, 2013), and 685 ("antalgic gait" on March 10, 2014). The ALJ did not offer a reasonable explanation for her conclusion that Plaintiff could ambulate normally in light of a plethora of evidence between the AOD of December 19, 2011, and the May 27, 2014 decision that suggested Plaintiff required an assistive device to ambulate.

The ALJ included no provisions in the hypothetical question to the VE or the assessed RFC for use of a cane or a walker. *See* Tr. at 20. Sedentary work requires some lifting, carrying, standing, and walking. *See* SSR 96-9p. Use of a cane would limit Plaintiff to one-handed lifting and carrying, and use of a walker may preclude her from lifting and carrying objects while standing and walking. *See Bates v. Colvin*, No. 1:12-2225-MGL, 2013 WL 5883381, at *10 (D.S.C. Oct. 30, 2013) ("Also of significance is the VE's testimony regarding how the use of a cane impacts an individual's ability to

work. The VE stated that the use of a cane for assistance would be a negative vocational factor and would create problems if the hypothetical individual needed to have one hand occupied with the cane."). Because the ALJ failed to consider the evidence that overwhelmingly indicated Plaintiff required an assistive device to ambulate, she assessed an RFC that did not adequately represent Plaintiff's limitations as required by SSR 96-8p.

b.    GAF Scores

Plaintiff argues the ALJ did not appropriately assess her GAF scores in accordance with Administrative Message 13066 ("AM-13066"), an internal agency directive to decision makers on how to consider GAF scores. [ECF No. 18 at 21–23]. The Commissioner maintains the ALJ did not err in failing to discuss Plaintiff's GAF scores because the Social Security Regulations do not address GAF scores. [ECF No. 20 at 18–19]. She argues that to the extent the ALJ might have erred in addressing Plaintiff's GAF scores, she redeemed the error by addressing the treatment records that contained the GAF scores. *Id.* at 18.

In prior cases, this court has held that GAF scores are meaningful to the claimant's functioning only at the time that they are assessed and lack meaning without additional context. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009). The psychiatric community has moved away from the use of the GAF scale and omitted it from the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-5*"). *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013 ("It was recommended that the GAF be dropped from DSM-5 for several reasons, including its

39

conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice."). Despite the psychiatric community's reduced reliance on the GAF scale, the SSA issued a directive that ALJs consider GAF scores within the following parameters:

> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 CFR § 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by 20 CFR § 416.927(c), and SSR 06-03p, while keeping the following in mind:

> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

*Emrich v. Colvin*, 90 F. Supp. 3d 480, 492 (M.D.N.C. 2015), citing AM-13066.

In *Johnson v. Colvin*, No. 6:14-3579-RBH, 2016 WL 462430, at *7 (D.S.C. Feb. 8, 2016), the court considered and rejected the plaintiff's argument that AM-13066 requires ALJs to analyze every GAF score of record as a medical opinion. Judge Harwell observed that "the ALJ noted that Plaintiff was initially assigned a GAF score of 50" and "[t]hereafter, his GAF score was 60 in June 2012." *Id.* He found that "the ALJ considered the fact that Plaintiff's GAF score rose after he began treatment, and that he was generally compliant with his medications" and held that the plaintiff did "not show that the ALJ did not adequately consider GAF scores as evidence." *Id.*

40

The ALJ indicated Plaintiff was initially prescribed medications for depression and anxiety from her primary care provider, but was eventually referred to Catawba Mental Health Care for outpatient treatment. Tr. at 23. She noted that Plaintiff's mental health symptoms were generally stable when she was compliant with treatment and that she had not been hospitalized for psychiatric reasons. *Id.* She indicated the record contained evidence that Plaintiff was noncompliant with treatment, at times. Tr. at 24. The ALJ noted that Plaintiff's medications were adjusted and that, by October 2013, her GAF score was assessed to be "63, which suggests moderate difficulty in social, occupational or school functioning."[5] *Id.* She stated Plaintiff reported pulling her hair out the next month, but that her therapist indicated her mood had improved and her affect was brighter. *Id.* She noted Plaintiff continued to show improved symptoms in January and March 2014. *Id.*

The record reflects assessments of Plaintiff's GAF scores that ranged from 50 to 64. Tr. at 380, 386, 396, 399, 452, 455, 465, 469, 471, 591, 593, 595, 597, 599, and 611. A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR*. A GAF score of 51–60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR

---

[5] In fact, a GAF score of 63 is consistent with mild symptoms. *DSM-IV-TR*.

some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *Id.*

Although the record shows that Plaintiff had GAF scores of 50, which were consistent with "serious symptoms," during her first two visits with Dr. Gay in June and October 2011, her GAF scores improved with medication compliance and prolonged treatment and were most often suggestive of mild or moderate symptoms. *See* Tr. at 465, 591, 593, 597, 599, and 611. Aside from a reference to a GAF score of 63 in October 2013, the ALJ did not cite Plaintiff's GAF scores, but her general findings regarding the severity of Plaintiff's symptoms were consistent with those GAF scores. Thus, it appears that the ALJ's error in failing to cite particular GAF scores was harmless in that she would have reached the same conclusion if she had examined Plaintiff's GAF scores more closely. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of Social Security benefits where the ALJ erred in pain evaluation because "he would have reached the same result notwithstanding his initial error); *see also Plowden v. Colvin*, No. 1:12-2588, 2014 WL 37217, at *4 (D.S.C. Jan. 6, 2014) (noting that the Fourth Circuit has applied the harmless error analysis in the context of Social Security disability determinations). In light of the court's holding in *Johnson* and the fact that the ALJ reached the same conclusion she would have reached if she had placed greater emphasis on Plaintiff's GAF scores, the undersigned recommends the court find the ALJ did not err in failing to analyze all of Plaintiff's GAF scores as part of the RFC assessment.

42

3.    Plaintiff's Subjective Reports

Plaintiff argues the ALJ provided legally insufficient reasons for rejecting her subjective report of symptoms. [ECF No. 18 at 25]. She maintains the ALJ failed to specify which testimony was not credible, which evidence in the record rendered her testimony incredible, and how much weight her testimony was given. *Id.* at 27. She contends the court should reject the Commissioner's effort to provide post hoc rationalization for the ALJ's findings. [ECF No. 21 at 4–5].

The Commissioner argues that despite using the boilerplate language identified as problematic by the court in *Mascio*, the ALJ properly analyzed Plaintiff's credibility elsewhere in her decision. [ECF No. 20 at 20]. She contends the ALJ cited Plaintiff's relatively stable objective findings and clinical signs, her lack of reported side effects, an absence of changes in her medications or dosages, her routine and conservative mental health treatment, her occasional noncompliance with medication management, her weak work history, and her daily activities in evaluating her subjective complaints. *Id.* at 20–21.

In considering symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, the ALJ should first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p. After determining that the individual has a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ should evaluate the

43

intensity, persistence, and limiting effects of her symptoms to determine the limitations they impose on her ability to do basic work activities. *Id.* If the individual's statements about the intensity, persistence, or limiting effects of her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the individual's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following when assessing the credibility of an individual's statements:

1. The individual's ADLs;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

44

*Id.*

The ALJ must specify her reasons for the finding on credibility, and her reasons must be supported by the evidence in the case record. *Id.* Her decision must clearly indicate the weight she accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio*, 780 F.3d at 639, the court agreed with the Seventh Circuit that the ALJ "'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility.'" The court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence in the record and indicated an ALJ should explain how she decided which of a claimant's statements to believe and which to discredit. *Id.* at 639–40. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, --- F.3d ---, 2016 WL 3349355, at *10 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

In the case *sub judice*, the ALJ stated that Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms she alleged, but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible for the reasons outlined in the decision. Tr. at 21. She indicated the medical evidence did not "show the objective findings and clinical signs that one would expect to see in an individual with the degree of symptoms and limitations alleged by the claimant." *Id.* She noted that Plaintiff underwent right hip replacement in March 2011 and left hip replacement in February 2012, but indicated there was "evidence of

functional improvement." *Id.* She stated "the medical evidence does not document a continuing impairment of incapacitating proportions, i.e., one which would produce pain of such intensity that the ordinary physical activity to perform basic work-related functions would be impossible or contraindicated for a continuous period of twelve months or more." Tr. at 23. She indicated Plaintiff's primary care records showed "relatively stable objective findings and clinical signs, which suggest the claimant's musculoskeletal problems are responsive to medications." *Id.* She noted Plaintiff reported no significant side effects from her medications and required no significant changes to her medications or dosages. *Id.* She indicated Plaintiff's mental health symptoms were relatively stable when she was compliant with treatment. *Id.* She stated she considered Plaintiff's work history and ADLs in assessing her credibility. Tr. at 25. She indicated Plaintiff's work history "is weak and suggests that she did not work consistently or in a manner reasonably approaching maximum potential." *Id.* She noted Plaintiff failed to report to her doctors that she had a limited ability to sit and to lift. *Id.* She stated Plaintiff's ADLs, which included participating in four weeks of vocational rehabilitation, taking a knitting class, straightening up around the house, cooking, and attending church, suggested she had greater abilities than she admitted. *Id.*

Although the ALJ provided a lengthy explanation for her decision to find Plaintiff had "greater abilities than she admitted," Tr. at 25, she did not create an accurate and logical bridge between the evidence and her conclusions. Her decision does not show that she considered all of the factors that precipitated and aggravated Plaintiff's pain and other symptoms or the measures Plaintiff used to alleviate her symptoms. *See* SSR 96-7p. This

was evident with regard to Plaintiff's allegations of difficulty maintaining pace; problems with balance and need for an assistive device; and need to elevate her legs after sitting or standing. *See* Tr. at 41, 43–44, 45, 49, and 54–55. As discussed above, the medical opinions and evidence of record support Plaintiff's allegations that she had difficulty maintaining pace and required an assistive device to ambulate. *See* Tr. at 85–86, 101–02, 301, 306, 314, 347, 349, 361, 362, 372, 411, 484, 507, 564, 566, 610, 633, 678–79, and 685. The record also reflects Plaintiff's complaints about lower extremity swelling and Mr. Plyler's recommendation that she elevate her legs. Tr. at 345, 562, 564, 573, 605, 662, and 685. While the ALJ provided reasons for generally discounting Plaintiff's credibility and the severity of her pain, she did not address these specific allegations of functional limitations. In light of the forgoing, the undersigned recommends the court find the ALJ failed to consider Plaintiff's statements in accordance with the provisions of SSR 96-7p and the Fourth Circuit's decisions in *Mascio* and *Monroe*.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

Shiva V. Hodges

August 3, 2016                          Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).